IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **JANIE LUNSFORD**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action Number |
| **vs.** ) | **2:02-cv-960-UWC** |
| ) | |
| **BELLSOUTH TELECOMMUNICATIONS,** ) | |
| **INC.,** ) | |
| ) | |
| Defendant. ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In this action brought under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), the Plaintiff Janie Lunsford claims that her employer, BellSouth Telecommunications, Inc. ("BellSouth") arbitrarily and capriciously denied her claim for disability benefits.

In the administration of its disability plans, BellSouth operates under a conflict of interest, therefore the "heightened arbitrary and capricious" standard applies. *Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1141 (11th Cir. 2001); *Williams v. BellSouth Telecomm. Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004); *Brown v. Blue Cross and Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1562 (11th Cir. 1990).[1] BellSouth has the burden of proving that its denial of the

---

[1] This standard applies notwithstanding that the plan administrator has delegated its claims processing duties to a third party, unless the third party has the "ultimate authority" to decide whether the claim should be approved or denied." *Buce*, 247 F.3d at 1141.

Plaintiff's application was not tainted by self-interest. *Williams v. BellSouth Telecomm.*, 373 F.3d 1132, 1138 (11th Cir. 2004).

Based on the Findings of Fact which follow, the Court finds and concludes that BellSouth has not carried its burden. Accordingly, the appropriate relief will be granted to the Plaintiff.

### A. Findings of Fact

1. Plaintiff, Janie Lunsford ("Lunsford"), was at all times relevant, an employee of defendant, BellSouth Telecommunications, Inc. ("BellSouth") and as such she was a participant in its Short Term Disability Plan ("STD"), its Long Term Disability Plan ("LTD"), and in its Disability Pension Plan ("DPP"). Plaintiff was initially employed by BellSouth on June 18, 1973; and she worked at the Company until she became disabled.

2. BellSouth funds its STD, LTD, and DPP from its operating expenses.

3. Effective September 3, 1996, by contract, BellSouth delegated to Kemper National Services Disability Unit, a division of Kemper National Services, Inc. ("Kemper"), its claims administration functions.

4. Notwithstanding BellSouth's nominal delegation of the claims administration duties to Kemper, it retains the ultimate authority to determine whether disability applications should be denied or approved. Relevant language in the BellSouth-Kemper contract provides that "[w]here specific instructions as to a particular matter have been given [by BellSouth], Kemper is charged with strict compliance with such instructions, no matter

how broad its general powers may otherwise have been." (Pl.'s Ex. 17, BellSouth-Kemper Contract, p. 13.)[2]

5.     Under the terms of the BellSouth's STD Plan, an employee is eligible for benefits if, among other things, she

> is disabled and [is] unable to perform any type of work as a result of a physical or mental illness or an accidental injury. Any type of work includes [the employee's] regular job with or without accommodations, any other participating company job (regardless of availability) with or without accommodations, or temporary modified duties.

6.     BellSouth and Kemper have construed the term "disability" under the STD Plan to include only those individuals incapable of performing any type of work.

7.     The BellSouth LTD Plan defines disability to mean "a physical or mental illness, whether work- related or non-work related, which makes a participant who has been covered under the Short Term Disability Plan for 52 weeks unable to perform any type of work other than one which pays less than half of his base pay at the time his benefits under the Short Term Disability Plan begin."

8.     To become eligible for LTD benefits, an employee must have been approved

---

[2] The Eleventh Circuit reached the same conclusion based upon the same contract language between BellSouth and Kemper in *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1136-1137 (11th Cir. 2004).

BellSouth sometimes actually directs Kemper's processing of individual claims. This is evidenced by the testimony of at least two Kemper employees in two separate actions similar to the one at bar, where the Kemper employees testified to BellSouth's requesting an independent medical exam, and Kemper's compliance by scheduling the appointment. (Pl.'s Ex. 12, Cote Dep., p. 33); (Pl.'s Ex. 11, Vega Dep., p. 37.) Finally, the record contains a tape recording showing that when a Kemper representative called to advise a BellSouth employee that his benefits were being terminated, the representative disclosed to the employee that a certain BellSouth manager was "calling the shots," and that if the employee had any questions about his claim, he was to call the BellSouth manager. (Pl.'s Ex. 15, Tr. of Recording.)

for and received STD benefits and still be disabled after receipt of 52 weeks of STD benefits.

9. In addition to the 52-week STD benefit exhaustion requirement, an employee must demonstrate that she is still disabled to qualify for LTD benefits.

10. On June 4, 2001, and thereafter, Plaintiff did not report to work.

11. On June 5, 2001, Plaintiff's supervisor, Glenda Rheams, notified Kemper of Plaintiff's absence.

12. On June 6, 2001, Kemper attempted to reach Plaintiff and was informed by her husband that she was hospitalized.

13. On June 8, 2001, Kemper's intake personnel spoke with Plaintiff, who stated that she had been hospitalized for depression and anxiety since June 5, 2001. Plaintiff was advised that her claim would be assigned to a Case Manager and that Kemper needed to receive medical data from her treating physician supporting her disability claim no later than June 19, 2001, or her claim would be denied.

14. Kemper's intake personnel then spoke with the receptionist at the office of Plaintiff's treating psychiatrist, Dr. Patrick Atkins, and advised the receptionist of the need to receive medical data supporting Plaintiff's inability to work.

15. On June 11, 2001, Plaintiff's claim was forwarded to Kemper's Behavioral Health Unit (BHU), which processes claims premised on mental or psychiatric conditions, and the claim was assigned to Case Manager Eric Mayer.

16. On June 21, 2001, Kemper received a Behavioral Control Statement from Dr. Atkins dated June 19, 2001. In the Statement, Dr. Atkins evaluated Plaintiff in the following respects:

   **I.   Cognitive Functioning**
   A.   <u>Functional Indicators</u>
   i.   Able to write a sentence from dictation: YES
   ii.  Able to follow a three-step command: YES
   iii. Able to understand the nature of exam: YES
   iv.  Able to perform basic math: YES
   v.   Able to read a narrative paragraph from magazine or newspaper and report the main idea of the passage: YES

   B.   <u>Objective Impairments</u>: Decrease in attention and concentration; disorganized thoughts

   **II.  Emotional Functioning**
   A.   <u>Functional Indicators</u>
   i.   Able to smile upon greeting you: YES
   ii.  Able to do timed tasks with emotional ability: NO
   iii. Able to sit in waiting room for up to 15 minutes without becoming tearful: YES
   B.   <u>Objective Impairments</u>:  Anxiety, dysphoric, recent suicidal ideation requiring hospitalization from 6/5/01 through 6/11/01

   **III. Behavioral Control**
   A.   <u>Functional Indicators</u>
   i.   Demonstrates the ability to apply attention and concentration up to 5-10 minutes
   ii.  Able to engage in conversation (without a break) for up to 25-30 minutes
   iii. Able to apply practical judgment: YES
   iv.  Regularly uses telephone: YES
   v.   Able to use public transportation: YES
   vi.  Expresses anger without aggressive behavior: YES
   vii. Performs routine shopping: YES
   viii. Prepares meals: YES
   ix.  Maintains hygiene: YES
   x.   Pays bills:     YES
   B.   <u>Objective Impairments</u>: Hospitalized due to emotional instability and suicidal ideation with disorganized thoughts.

   **IV.  Diagnostic Impressions**: Major Depression, Generalized Anxiety Disorder

   **V.   Work Status**
   A.   <u>Patient's perspective</u>: The patient has conceptualized the following areas as barriers in returning to work: Symptoms interfering with functioning
   B.   <u>Clinician's Perspective</u>: Have you instructed (or continue to instruct) your patient not to return to work: NO.

5

Dr. Atkins opined that Plaintiff was unable to work but that he expected significant clinical improvement by January 2, 2002.

17.     After reviewing the information provided by Dr. Atkins, Kemper denied Plaintiff's application for STD benefits, except for the period of time that she was hospitalized from June 5, 2001, through June 11, 2001.

18.     Plaintiff timely appealed the denial of her application for STD benefits.

19.     Plaintiff 's counsel submitted additional medical evidence of her disability.

20.     On October 24, 2001, Lunsford's counsel advised Kemper that Lunsford had been awarded disability benefits from the Social Security Administration (SSA).

21.     On January 2, 2002, on behalf of Kemper, Dr. Devon Carpenter, a psychologist, reviewed Plaintiff's medical records.[3]

22.     Dr. Carpenter determined that Plaintiff had, in fact, remained impaired until August 8, 2001. However, he also concluded that she was no longer substantially impaired after that date.

23.     On behalf of BellSouth, Kemper determined that Plaintiff should be awarded benefits for the period June 12 to August 7, 2001, and denied benefits thereafter. BellSouth's self-interest, well-known by Kemper, was a motivating factor in the initial and ultimate decision

---

[3] The additional medical evidence included, *inter alia,* 1) Dr. Atkins' November 11, 2001 notice that Plaintiff's disability status had not changed (Pl.'s Ex. 2, Kemper File at pp. 195-198); 2) a letter dated October 26, 2001, from the Social Security Administration reflecting that Plaintiff had been awarded social security disability benefits; 3) Dr. Atkins' November 26, 2001 Behavioral Clinician Statement to Kemper, in which he reported that Plaintiff suffers from cognitive and emotional impairments; and (4) a November 19, 2001, Brookwood Medical Clinic progress note showing that Plaintiff suffers from depression.

to substantially deny Plaintiff's application for STD benefits.

24. At all times since June 4, 2001, Plaintiff has been unable to perform any type of work because of her mental illness.

25. Plaintiff has exhausted her administrative remedies under the STD

26. Plaintiff's pay at the time of the onset of her disability was $745 per week, or $2,980 per month.

27. Plaintiff is entitled to STD benefits at a rate of $745 per week for each week up to a total of 52 weeks, less the 42 days ($6,258.00) of STD benefits already paid to her by BellSouth. For the period STD benefits August 7, 2001 - June 11, 2002, Plaintiff is entitled to a total of $34,270.00 in accrued STD benefits.

28. Plaintiff is entitled to interest at 18% per annum on her accrued STD benefits, which totals $ 22,205.81 as of September 12, 2005. Thus, her accrued STD benefits and interest thereon total **$56,475.81.**

29. Plaintiff did not apply for LTD benefits because it would have been futile to do so. Under the Plan, she would only become eligible for LTD benefits after having received 52 weeks of STD benefits. She did not receive 52 weeks of STD benefits only because of BellSouth's arbitrary and capricious denial of her application.

29. Plaintiff is entitled to LTD benefits at the monthly rate $1,711.73, less her social security award of $1,399, as of June 30, 2002. Thus, she is entitled to a total of $312.73 per month.

30.     Since Plaintiff remains disabled under the LTD Plan, she is entitled to DPP benefits in lieu of LTD benefits, at a monthly rate of **$1,397.44.**

31.     From June 5, 2002, through the present date, she is entitled to a total of $ 52,543.74 as accrued DPP benefits. Interest on these benefits at the rate of 8% comes to a total of $ 14,474.02.  Thus, Plaintiff's accrued principal DPP benefits and interest through September 12, 2005, amount to **$67,017.76.**

## CONCLUSIONS OF LAW

1.     BellSouth has failed to establish that its decision to deny Plaintiff's application for disability benefits was not tainted by self-interest.

2.     BellSouth's decision denying Plaintiff's application for STD was arbitrary and capricious.

3.     It would have been futile for Plaintiff to exhaust her administrative remedies for LTD benefits.

4.     Plaintiff is entitled to recover of BellSouth a total of **$56,475.81** in interest and accrued STD benefits.

5.     Plaintiff is entitled to recover of BellSouth a total of **$67,017.76** in interest and accrued DPP benefits.

6.     For as long as she remains disabled, Plaintiff is entitled to receive from BellSouth the amount of **$1,397.44** as disability pension benefits.

By separate order, the appropriate relief will be granted.

Done this 13th day of September, 2005.

_____
U.W. Clemon
Chief United States District Judge